IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CITY OF HUNTINGTON, WEST VIRGINIA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. _____ |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and BENJAMIN CARSON, SECRETARY, in his Official Capacity, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

As its complaint in this matter, Plaintiff, the City of Huntington, West Virginia,

avers as follows:

1. Plaintiff the City of Huntington is an "entitlement" grantee in a federal grant

   program administered by Defendant, the Department of Housing and Urban

   Development ("HUD"), which is overseen by Defendant Secretary Benjamin

   Carson.  Congress has provided in clear and uncertain terms that the Secretary

   shall take certain remedial actions when he finds, **but only after providing a**

   **grantee reasonable notice of the opportunity for a formal  administrative**

1

**hearing,** that the recipient has not complied with applicable regulations.  In this case, the City has used its grant funding in a highly successful affordable housing development in a blighted area.  Notwithstanding the success of the development, HUD has imposed and is attempting to further impose penalties on the City, without notice and conducting an administrative hearing, and also without consideration of the evidence that the City has provided, although the controlling law unambiguously mandates that notice and an opportunity for a hearing is required.  By this action, the City seeks to enjoin HUD and the Secretary from taking this *ultra vires* action, and to compel them, if they wish to impose sanctions, to abide by the required remedial provisions set forth by Congress and in HUD's own regulations.  In addition, the City seeks reversal of the penalties already imposed.

## PARTIES AND JURISDICTION

2.  Plaintiff City is a class II municipality under West Virginia law.

3.  Defendant HUD is an agency of the federal government, with headquarters in this district, and Benjamin Carson is its Secretary.  Secretary Carson is sued in his official capacity only.

4.  Jurisdiction in this Court is based on 28 U.S.C. 1331, in that the City has claims arising under federal law, namely the Cranston-Gonzalez Affordable Housing Act, as amended, 42 U.S.C. §§ 12741 *et seq.* and the Administrative Procedures

Act, 5 U.S.C. §§ 701 *et seq.* ("APA").  The sovereign immunity ordinarily enjoyed

by agencies of the federal government has been waived for HUD for actions of

this kind by 42 U.S.C. § 1404a, and also by the APA. 5 U.S.C. § 702.  In addition,

the City seeks declaratory relief pursuant to the Declaratory Judgment Act, 28

U.S.C. § 2201.

5. Venue is proper because both Defendants are resident in this district.  28 U.S.C.

1391(b)(1).

FACTUAL BACKGROUND

A.  The HOME Program

6. Congress created the HOME Investment Partnership Program in 1990, as Title II

of the National Affordable Housing Act.  42 U.S.C. §§ 12701 *et seq.* (the Act).

The Act's purposes are set forth in section 203 of the Act, 42 U.S.C. § 12722, and

include, *inter alia*, the following:

(a)     to expand the supply of decent, safe, sanitary, and affordable housing
        with primary attention to rental housing, for very low-income and low-
        income Americans;

(b)     to mobilize and strengthen the abilities of States and units of general
        local government throughout the United States to design and implement
        strategies for achieving an adequate supply of decent, safe, sanitary, and
        affordable housing;

(c)     to provide participating jurisdictions, on a coordinated basis, with the
        various forms of Federal housing assistance, including capital
        investment, mortgage insurance, rental assistance, and other Federal
        assistance, needed— (1) to expand the supply of decent, safe, sanitary,

3

and affordable housing; (2) to make new construction,
rehabilitation, substantial rehabilitation, and acquisition of such housing
feasible; and (3) to promote the development of partnerships among the
Federal Government, States and units of general local government,
private industry, and nonprofit organizations able to utilize effectively all
available resources to provide more of such housing . . .

7. A primary method by which the HOME Program accomplishes these objectives
is by the establishment of a HOME Investment Trust Fund, and a line of credit
for each state and local participating jurisdiction. Section 218, 42 U.S.C. §12748.
The City has been a participating jurisdiction since 1992.

8. Under section 218(c), the balance of a jurisdiction's line of credit may be reduced
in three ways: (i) the jurisdiction drawing down funds; (ii) funds automatically
expiring through non-use under section 218(g); or (iii) penalties assessed under
section 223 of the Act (42 U.S.C. § 12753), if, but only if, HUD follows the
proper procedures. Paragraph (g) of section 218 provides a jurisdiction's right to
funds that are not placed under a binding commitment within 24 months after the
last day of the month in which the jurisdiction receives the funds expires, and that
the Secretary will reduce the line of credit accordingly.

9. Uncommitted funds that are recovered under section 218(g) of the Act are
eventually redistributed to other jurisdictions participating in the HOME
program. Section 218(g) does not provide statutory authority to capture or
recover HOME funds that were appropriated in a subsequent year.

4

10.  Over time, it has become apparent that the 24-month period for commitment of HOME funds is too short.  In 2016, Senators Feinstein and Portman proposed to amend HUD's annual appropriations bill to suspend the expiration of HOME funds.  See Cong. Rec. S2829, S 2830 May 16, 2016.  While this provision did not pass, in the HUD Appropriations Acts for fiscal 2017, 2018, and, now, 2019, Congress has suspended the expiration (and thus de-obligation) of HOME funds relative to this restriction.  Section 242 of Title I of Division K of the Consolidated Appropriations Act, 2017(Public Law 115-36); Section 235 of Title II of Division L of the Consolidated Appropriations Act, 2018 (Public Law 115-141); Section 233 of Title II of Division F of the Consolidated Appropriations Act of 2019 (Public Law 116-6).

11. Section 223 of the Act makes clear that penalties – including the reduction of the line of credit by the amount of expenditures that HUD claims were not in accordance with the requirements of the Act – are only to be imposed after notice and an opportunity for an administrative hearing are provided to the grantee, and specific findings are made.  42 U.S.C. § 12753.

12. As will be explained in detail below, the dispute here between the City and HUD is about whether the Congressional direction for prior notice and an opportunity for a hearing procedural requirement, in addition to the substantive provisions of the Act and its implementing regulations, apply to the actions HUD has attempted to take here.

13. In sections 231 and 232 of the Act, 42 U.S.C. §§ 12771 and 12772 respectively, Congress directed that at least fifteen percent of HOME grant funds must be used solely by Community Housing Development Organizations ("CHDOs").

14. The eligibility of participating jurisdictions, and subgrantees, and of projects for which HOME program funds may be used is set forth in the statutes, and further fleshed out in the regulations.

15. HUD adopted regulations to implement the HOME program in 1996.  61 Fed. Reg. 48750 (Sept. 16, 1996).  HUD made a significant revision to the regulations in 2013.  78 Fed. Reg. 44664 (July 24, 2013).  Some of the revisions were effective as of August 23, 2013, while others took effect much later.  *See* 24 C.F.R. § 92.3.

16. CHDO was and remains a defined term in the regulations.  24 C.F.R. § 92.2.

17. The HUD regulations also include due process requirements before certain remedial actions may be taken.  For example, the regulation setting forth the sanctions HUD may impose provides as follows:

> **(a) If HUD finds after reasonable notice and opportunity for hearing** that a participating jurisdiction has failed to comply with any provision of this part and until HUD is satisfied that there is no longer any such failure to comply:
>
> > **(1)** *HUD shall reduce the funds in the participating jurisdiction's HOME Investment Trust Fund by the amount of any expenditures that were not in accordance with the requirements of this part*; and
> >
> > **(2)** HUD may do one or more of the following:

(i) Prevent withdrawals from the participating jurisdiction's HOME Investment Trust Fund for activities affected by the failure to comply;

(ii) Restrict the participating jurisdiction's activities under this part to activities that conform to one or more model programs which HUD has developed in accordance with section 213 of the Act;

(iii) Remove the participating jurisdiction from participation in allocations or reallocations of funds made available under subpart B or J of this part;

(iv) Require the participating jurisdiction to make matching contributions in amounts required by §92.218(a) as HOME funds are drawn from the participating jurisdiction's HOME Investment Trust Fund United States Treasury Account. Provided, however, that HUD may on due notice suspend payments at any time after the issuance of a notice of opportunity for hearing pursuant to paragraph (b)(1) of this section, pending such hearing and a final decision, to the extent HUD determines such action necessary to preclude the further expenditure of funds for activities affected by the failure to comply.

(b) *Proceedings.* When HUD proposes to take action pursuant to this section, the respondent in the proceedings will be the participating jurisdiction or, at HUD's option, the State recipient. Proceedings will be conducted in accordance with 24 CFR part 26.

24 C.F.R. § 92.552 (emphasis added).  Thus, the regulation tracks the statute closely.

## B. The Fairfield West Development Plan

18. The City's blighted Fairfield West area was long plagued with criminal activity including illegal drug use, prostitution, and vacant properties turned into crack houses.  The City designated the neighborhood a slum and blighted area, in February 2013, and sought to use federal grant funding, through the HOME program, to help create a more sustainable community with safe and affordable

housing.  One key element of the City's plans was the development of the Fairfield West Redevelopment Plan, which would be a multi-site development and construction of more than 40 affordable housing units, spread over at least 5 parcels.

19. In the summer of 2012, the City entered into an agreement with a CHDO, the Housing Development Corporation ("HDC"), a non-profit with significant affordable housing experience, to prepare a redevelopment plan, and implement that plan, once the City had approved it, by buying several parcels of land, and constructing new affordable rental housing.  HDC is a Community Housing Development Organization ("CHDO") as that term is defined in 24 C.F.R. § 92.2. This was a multi-year project, and the first contract between the City and HDC for the project was executed on July 12, 2012.

20. HDC set about performing the agreement.  It created the Redevelopment Plan, which was approved by the City on February 25, 2013.  It ultimately acquired 8 parcels – 5 were acquired for a total cost of $259,799, and developed for affordable housing – and three more, for a total cost of $34,152, which were not timely used for affordable housing (the "Three Lots").  The City and HDC agree that these funds shall be returned.

21. The agreement between the City and HDC was further amended on October 1, 2013, adding $311,704.50 to the contract, for the development of a two-family duplex.

22. The agreement was amended again on June 1, 2014 adding an additional $347,171.56 for another two-family duplex.

23. The City entered into a new agreement with HDC on July 10, 2015 for the construction of the 40-unit Huntington Gardens Apartments, in the amount of $843,265.  This was amended on March 26, 2016 with the addition of $654,959, so that the amended total commitment under this contract was $1,498,224.

24. The project also included two more duplexes; by the summer of 2015, the City was working closely with the CHDO and with the Huntington Urban Renewal Authority ("HURA") to get this part of the project under way.  The land had been acquired, and the City was gathering information for the environmental reviews.  The contractor had been selected, and, because of the prior work on the project, an accurate estimate of the costs for this part of the project were included in HUD's IDIS record-keeping system for the project.

25. In August 2016, the City requested, and the HUD Field Office recommended, that an extension of time be given to allow the City to drawdown funds for the project, to bring it to completion.  HUD took nearly a year to respond, and even then did not specifically grant or deny the request.

## C. The Current Dispute

*HUD Letter of July 24, 2017*

26. John E. Tolbert III, Director of the Office of Community Planning and
   Development and HUD's Pittsburgh Field Office sent a formal response to the
   City's request for an extension to complete the Huntington Gardens 40 unit
   building on July 24, 2017.  This HUD letter went far beyond the issue of the
   timing of completion of the project, however, and raised a number of new issues.

27. In this letter, HUD incorrectly claimed:

   a.  HDC was not an eligible CHDO;

   b.  the amendments to add two-family duplexes were executed prior to the
       completion of environmental reviews, and raised other questions
       concerning the timing of the environmental reviews;

   c.  the City had expended funds before it had a written agreement, based on
       the erroneous conclusion that the amendment of October 1, 2013 was
       the operative agreement;

   d.  the City had used HOME funds to purchase property from HURA,
       which HUD inaccurately claimed is an agency of the City;

   e.  because the first "valid" commitment of HOME funds occurred on
       October 1, 2013, all funds committed  prior to that date are disallowed,

and must be repaid.  HUD calculated that a total of $408,814 must be repaid;

    f.   the City had only timely committed a portion of its HOME funds, and, because uncommitted funds must be de-obligated, the City's funding allocation must be reduced, by a total of $965,114.

    g.   under section 218(g) of the Act HUD had the authority to de-obligate the $965,114 from the City's HOME account at the Department of Treasury, and indicated that it planned to do so, from amounts allocated in fiscal years "to be determined later," and demanded that the repayment of the $408,814 be completed in 45 days.

28. The HUD letter had numerous errors, many of which were pointed out by the City in subsequent correspondence.

*City Letter of September 8, 2017*

29. Scott Lemley, the Executive Director of the City's Department of Development & Planning, responded by letter of September 8, 2017.  A copy of this letter is attached as Exhibit A hereto.

30. The City explained that it had substantively complied with applicable environmental review provisions.

31. The City refuted HUD's claim that the Fairfield West Redevelopment Plan does not meet the HOME definition of "project."

32. The City agreed that HOME construction deadlines for the Three Lots purchased for $34,152 had not been met and noted that HDC is obligated to repay these funds to the City's local HOME account.

33. The City indicated to HUD that if it did not accept the City's explanations, then the City requested a hearing on the matter, using the procedures in HUD's regulations.

*City Legal Counsel Letter of May 21, 2018*

34. HUD did not respond to the City's September 8, 2017 letter. In fact, HUD has never responded to the City's assertions nor provided notice and hearing in this matter.

35. The City retained outside legal counsel, Otto Hetzel, Esq., a former Associate General Counsel of HUD to represent it on these issues.  He sent two letters to HUD: his first, dated May 21, 2018, addressed HUD's contentions regarding the legal status of HDC and the HURA.  A copy of this letter is attached as Exhibit B.  His second letter, discussed in section (d) below, was sent on August 21, 2018, and addressed the merits of HUD's contentions regarding compliance with applicable procedural regulations covering the $408,814 (less the $34,152).

36. In his May 21, 2018 letter, Mr. Hetzel demonstrated, contrary to HUD's contention, that HDC is in fact an eligible CHDO.  HUD's claim about HDC eligibility was based on a regulation that might have been applicable had HDC

been a governmental entity, or one controlled by the City.  However, because

HDC is an independent legal entity, the claimed flaws do not affect its status as a

CHDO.

37. The City's legal counsel also showed that the HURA is not a City agency, but

rather is in fact an agency of the State of West Virginia.  Thus, HDC's acquisition

of property from HURA is not self-dealing, as HUD had claimed.

*City Legal Counsel Letter of August 21, 2018*

38. HUD did not respond to the City's legal counsel's letter of May 21, 2018.

39. The City's legal counsel sent a second letter to HUD on August 21, 2018.  A copy

of this letter is attached as Exhibit C.  In this letter he addressed HUD's

contention that the City was required to repay $408,814 using non-federal funds,

because of allegedly improper expenditures from the City's HOME account on

the Fairfield West Redevelopment Plan.

40. Mr. Hetzel explained that HUD was mistaken about the correct legal status of the

City's developer, and about which regulations apply to the expenditure of HOME

funds.   He reiterated, from his May 21 letter, that HDC qualifies as a certified

CHDO.

41. The City's legal counsel also showed that the agreement between the City and

HDC to develop and implement the Redevelopment Plan was executed in 2012.

It was appropriate under the regulations in effect at that time for the City to commit funds to the project for the non-construction phase.

42. The City's legal counsel pointed out that the regulations that HUD is basing its contentions concerning the commitment of funds for the pre-construction phase did not become effective until October 22, 2013.

43. The City's legal counsel demonstrated that the City had fully complied with environmental review requirements applicable to the project.

44. Mr. Hetzel examined the various costs incurred in the preconstruction phase and showed that of the $408,814 asserted by HUD to be improper, only the $34,152 for the Three Lots needed to be repaid by HDC from non-federal funds.  The City, through its legal counsel, again offered to have HDC repay the $34,152.

*HUD Letter of October 17, 2018*

45. Mr. Tolbert sent the City a letter dated October 17, 2018.  A copy of this letter is attached as Exhibit D.

46. This letter did not at all acknowledge the May 21 or August 21, 2018 letters from the City's legal counsel, or, indeed, the letter sent by the City on September 8, 2017, and was largely a repeat of the groundless assertions HUD had made in its July 24, 2017 letter.  HUD did not discuss, much less controvert, the evidence described in those letters on behalf of the City, nor did it contradict any of the City's contentions.  Instead, HUD simply repeated its allegation that the City must

14

repay $408,814 it had spent on the Fairfield West Redevelopment Plan and demanded repayment within 45-days from non-federal (i.e., state or local taxpayer) funds.  The 45-day period ended on Saturday, December 1, 2018, and HUD did not, because it could not, demonstrate that the July 12, 2012 contract between the City and HDC was not, at the time it was made, a valid commitment of HOME funds.  HUD did not, because it cannot, demonstrate that the City failed to comply with environmental review regulations.

47. In addition to its unjustified demand that the City repay $408,814, in its October 17, 2018 letter, HUD again sought to impose an additional penalty on the City. Leveraging its contention that the $408,814 was misspent, and thus not properly committed, HUD claimed that the City failed to meet its 24-month commitment targets for Fiscal years 2012 and 2015.  Therefore, HUD invalidly again claimed , that HUD is required to "de-obligate $965,114 from the City's HOME Treasury account."

48. While HUD's letter of July 24, 2017 had not specified what funds would be taken back from the City, in this October 17, 2018 letter, HUD now indicated that its Pittsburgh Field office had been "directed" to de-obligate $326,555.90 of the City's $511,948 fiscal year 2017 HOME allocation (this is a 63.8% reduction) and $638,558.10 of the City's $704,044 fiscal year 2018 HOME allocation, for a 90.7% reduction.

*HUD De-obligates HOME Funds*

49. Sometime between December 7, 2018 and December 10, 2018, HUD de-obligated $326,555.90 from the City's FY 2017 allocation, and de-obligated $638,558.10 from the City's FY 2018 allocation. It did so without appropriate notice and providing an administrative hearing.

50. HUD took this action notwithstanding the explicit direction from Congress suspending the expiration and de-obligation of HOME funds, which included funds expiring in 2019 and 2020 (thus funds that were received by jurisdictions in 2017 and 2018).

51. These reductions, if allowed to stand, are catastrophic to the City's HOME program, and to its efforts to mitigate the affordable housing crisis it suffers.

52. These reductions are also not supported or explained in the HUD letters, or otherwise, and appear, at best, to be based on some double counting of amounts HUD claims were improperly spent.

53. The first phase of the Fairfield West Redevelopment Plan, including the 40-unit Huntington Gardens apartment building and two duplexes, was completed by December 2016, and is currently occupied and serving lower-income residents of the City. The overall project is continuing, and the continued availability of federal grant funding that has already been allocated to the City for the next phase is essential to providing additional affordable housing to its residents. HUD

would deprive City residents of these needed funds without according the City the

procedural protections which Congress required first occur.  These funds are

critical to the City' goals of providing more essential affordable housing and

stabilizing blighted neighborhoods.  The City plans to continue with the Fairfield

West Redevelopment Plan for ten years at least, if funding is available.  The

FY2017 and FY2018 funds that HUD has de-obligated would have been used for

additional affordable duplexes.

## COUNT I
## ARBITRARY AND CAPRICIOUS AGENCY ACTION

54. The averments of paragraphs 1 through 53 are incorporated herein as if fully set
    forth.

55. HUD's letter of October 21, 2018 and de-obligation of funds in December 2018
    are, collectively, effectively final agency action.  HUD made a specific demand for
    repayment with a specific deadline and announced the de-obligation of funds in
    the City's HOME Trust Fund.  While this HUD action is unlawful because HUD
    has not afforded notice and an opportunity for a hearing, from the text of the
    letter, it is apparent HUD contemplates no further action beyond its
    implementing the de-obligation.

56. The actions proposed by HUD in its letter of October 21, 2018 and its
    deobligation action amount to the imposition of a penalty as that term is explicitly
    described in section 223 of the HOME statute, 42 U.S.C. § 12753.  Under that

section, and the applicable regulation, 24 C.F.R. § 92.552, the imposition of such a sanction is only lawful after notice and an opportunity provided for an administrative hearing.

57. Neither the Act nor the regulations under the Act authorize HUD to take the actions it has taken here – demanding repayment of some funds, and de-obligating other funds – without formal notice and the opportunity for an administrative hearing.  None of the actions HUD has taken with regard to the Fairfield West Redevelopment Plan are automatic under the Act, or HUD regulations.  The Secretary must make findings based on notice and a hearing before implementing any sanctions.

58. Although HUD erroneously claims that the City failed to timely comply with some environmental requirements, it is important to note that the alleged violations are purely technical, having to do with the timing of certain administrative actions.  HUD does not and cannot claim that the Fairfield West Redevelopment Plan itself does not comply with all applicable substantive environmental regulations and HUD has never made that claim.  That HUD nonetheless seeks to impose a sanction for the alleged violations, although there is no substantive issue, reflects that its intentions are punitive, since they are neither remedial, nor automatic under the controlling law.

59. The City requested formal notice and a hearing, but HUD is imposing this penalty ignoring its obligation to provide formal notice and the opportunity for a hearing which would have required HUD to justify its de-obligation action.

61. HUD's regulations specify that the administrative hearing proceeding is to be conducted under 24 C.F.R. part 26.  HUD's letter of October 17, 2018 is not adequate notice of the right to a hearing under applicable law.

62. HUD has never addressed any of the substantive points raised in the City's correspondence.  These letters on behalf of the City, and the facts referred to in them, show that the sanction HUD seeks to impose is unjustified and therefore unlawful.

63. This Court has jurisdiction to preserve the status quo pending any hearing that the City has requested and that the controlling law requires HUD to conduct, **prior** to the imposition of potential sanctions.

64. The de-obligation of fiscal year 2017 and 2018 funds was arbitrary, capricious, and contrary to law.

65. There is an actual controversy between the City and HUD whether HUD may proceed as it has without first providing notice and an opportunity for hearing as Congress clearly intended.

66. The City and its residents will be irreparably harmed if HUD is permitted to deprive the City of HOME funds without the due process mandated by Congress.

67. The City has no adequate remedy at law for HUD's failure to accord it the due process mandated by Congress.  This is particularly true if HUD is permitted to redistribute the funds it unlawfully de-obligated to other jurisdictions.

## PRAYER FOR RELIEF

Plaintiff the City of Huntington, West Virginia, prays for the following relief:

a.  A preliminary injunction order preventing HUD and/or Secretary Carson and his privies from defunding or depriving City residents of HOME funds, or distributing such funds, while an application for a permanent injunction is under consideration;

b.  A permanent injunction preventing HUD and/or Secretary Carson and his privies from defunding or depriving City residents of HOME funds, or distributing such funds, unless and until a proper determination to do so has been specifically made after notice and an opportunity for a hearing is provided; and

c.  An Order directing HUD and/or Secretary Carson to restore any funds de-obligated from the City's HOME account.

d.  In the alternative, if the Court determines that HUD is not required to accord the City notice and an opportunity for a hearing, the City requests an order declaring that HUD has acted in an arbitrary and capricious manner in de-obligating the $965,114 from the City's HOME account, and that the

City is not obligated to repay $374,662 still at issue in the $408,916 HUD

has demanded by paid from non-federal funds.

_____/s/ *Charles H. Carpenter*_____
Charles H. Carpenter
(D.C. Bar. No. 432004)
Carpenter Law Firm plc
210 North Higgins Ave Suite 336
Missoula Montana 59802
(406) 543-0511

Otto Hetzel
(D.C. Bar. No.146431)
1100 Connecticut Ave,  Suite 600
Washington DC 20036
(202) 321-1500

Attorneys for the City of Huntington
West Virginia

VERIFICATION

I, Scott Lemley, declare as follows:

I am the Executive Director of the Department of Development and Planning for the City of Huntington, West Virginia.

I have personal knowledge of the Huntington Gardens project, and associated development, including those set out in the foregoing Verified Complaint for Injunctive Relief; and if called on to testify I would competently testify as to the matters stated herein.

I have personal knowledge of the correspondence between myself, and the City's outside legal counsel, and the United States Department of Housing and Urban Development.

I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Complaint concerning myself, the City's project, and our dispute with HUD are true and correct. 28 U.S.C. § 1746.

Executed on March _15_, 2019

_____
Scott Lemley